# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

---

No. 97-3802

---

| | |
|---|---|
| Jerry L. Fast, | * |
| | * |
| Appellant, | * |
| | *  Appeal from the United States |
| v. | *  District Court for the |
| | *  Western District of Missouri. |
| Southern Union Company, Inc., a | * |
| Delaware corporation, | * |
| | * |
| Appellee. | * |

---

Submitted:  May 11, 1998

Filed:  July 23, 1998

---

Before BOWMAN, Chief Judge, HEANEY, and HANSEN, Circuit Judges.

---

HEANEY, Circuit Judge.

Jerry Fast appeals the district court's order granting summary judgment in favor of Southern Union Company, the appellee, and from the district court's denial of his motion to amend his witness list. Fast, a former Southern Union manager, alleges that Southern Union terminated him because of his age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634, and the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. §§ 213.010-213.137. We reverse and

remand for trial on Fast's age discrimination claim and leave it to the district court's discretion on remand whether to permit Fast to amend his witness list.

I.

Because we are reviewing a summary judgment motion, we view the facts in the light most favorable to Fast, the non-moving party.  See Kraft v. Ingersoll-Rand Co., 136 F.3d 584, 586 (8th Cir. 1998).  Fast began working for Gas Service Company (GSC) in 1967.  Ownership of GSC changed several times during Fast's employment, with Southern Union acquiring the gas company in 1994.  Following Southern Union's purchase, Missouri Gas Energy (MGE), a subsidiary of Southern Union, began operating the company.

Shortly after acquiring the gas company, Peter Kelley, CEO and president of MGE,[1] held a number of meetings with key personnel to explain his corporate philosophy.  According to the record, Kelley indicated that dramatic changes were on the way.  Kelley allegedly stated that:  "Young blood" was needed at MGE and it would benefit from a "fresh new look"; he  preferred a younger work force because older workers tend to "stagnate"; the "older work force was pulling the company down"; "younger workers" were the future of the company;  "MGE was a good place to work for six or seven years, not over ten"; and he preferred a younger work force because they are "more inquisitive" and have "more energy."

As an MGE manager, Fast had the opportunity to attend one of Kelley's meetings with key personnel.  After the meeting, Fast noticed significant changes at MGE.  For example, MGE fired two of Fast's supervisors, both in their fifties.  In their place, MGE hired Carlon Nelson, who was thirty-four years old when she was hired. Nelson, who eventually became vice-president of operations for MGE, and Fast's

---

[1]Kelley was also the CEO of Southern Union.

2

supervisor, claimed that "Missouri Gas Energy was not efficiently operated, costs were uncontrolled, and significant operational and management changes were needed in many areas to enable the company to be competitive in the new entrepreneurial and deregulated environment." (Appellee's App. at 1.)

In the middle of 1995, Nelson attended several of Kelley's meetings. Nelson acknowledged that the meetings provided her with insight into Kelley's expectations for MGE's supervisors. Fast alleges that in a December 1995 meeting with Nelson, and at other times, Nelson stated that MGE was looking to put a fresh, new look on the company, that MGE needed to weed out stagnation in the management ranks and "bring in new, younger people with fresh ideas." According to Fast, Nelson warned him that Southern Union should not be viewed as a "place for ultimate retirement," and MGE was making room for a "new generation of leadership who had the energy and motivation to get the job done." Also, Nelson allegedly referred to Fast as "overhead."

Soon after the December meeting, Nelson terminated Fast. Nelson claims that, as part of MGE's effort to improve its efficiency and bottom line, MGE reduced its workforce and consolidated specific supervisory positions. For example, Nelson claims that MGE terminated certain managers, including Fast, and hired fewer "directors" with greater job responsibility.[2] Fast was fifty-one years old when Nelson fired him. The

---

[2]In her affidavit, Nelson described MGE's operational structure both before and after Fast was terminated:

> Under the pre-1996 organizational structure, the Operations Department was organized under the supervision of two Vice Presidents and was based primarily on function: one Vice President, located in Kansas City, oversaw all the primary operational functions (Pressure & Measurement, Construction & Maintenance, and Installation & Service) in all geographical regions except the southeastern; and the other Vice President oversaw those primary operational functions in the southeastern region only. The Vice President of Southeastern Operations reported informally to the other Vice President of Operations. Managers reporting

3

record indicates that, both within and outside Fast's department, all terminated managers were over age forty and/or had significant tenure at the company.[3]

After MGE terminated Fast from his position as field operations manager for MGE's eastern division, MGE hired Jeannie Miller, who was thirty-three years old at the time, as the director of the eastern region. Although the record indicates that Miller ultimately had broader job responsibilities than Fast, there was significant overlap. Despite these similarities, Nelson stated that Miller's job responsibilities were sufficiently distinct from Fast's job responsibilities. For example, Nelson stated in her affidavit that while Fast had no engineering responsibilities, Miller had significant engineering responsibilities. When asked in her deposition whether she had "any idea . . . what Mr. Fast's background was in dealing with the engineers when it was part of

> to these two Vice Presidents were responsible for discrete functions within their geographical regions.
>
> . . .
>
> All regional Directors of Operations now have wider responsibility than did the operations managers in the former organizational structure; the Directors are now responsible for engineering functions and have primary budget accountability, functions that previously were not the responsibility of the Managers. In addition, the Directors now have responsibility for all three primary operations functions within their geographic regions, including Construction & Maintenance, Pressure & Measurement, and Installation & Service.

(Appellee's App. at 3.)

[3]Carl Morse, for example, was in his mid-fifties when he was terminated by Southern Union. Like Fast, he had worked at the company for thirty years. Morse attended at least one of Kelley's meetings, and based on Kelley's comments, was left with the distinct impression that MGE was going to terminate older employees.

a centralized function," Nelson answered no. (Appellant's App. at 607.) According to his former supervisors, Fast was responsible for various engineering functions.

Nelson stated in her deposition that she terminated Fast without reviewing his performance evaluations or his personnel file. Nelson also stated that she ultimately fired Fast because he was unable to handle basic tasks effectively and because of his lack of education. Nelson noted that Miller earned an MBA while Fast only completed high school. Additionally, Nelson testified that Fast lacked new ideas or recommendations to make MGE more efficient.[4]

The district court granted Southern Union's summary judgment motion, determining that Fast's age discrimination case should be analyzed under the more exacting reduction-in-force (RIF) standard. Under the RIF standard, the court found that Fast was unable to make the required showing that age was a factor in his termination. The district court also denied Fast's motion to amend his witness list because of Fast's "lack of diligence in searching for witnesses" and because the witnesses would provide evidence "collateral to the main issue." Fast v. Southern Union Co., No. 96-0731-CV-W-2, slip op. at 15 n.3 (W.D. Mo. Sep. 15, 1997). Fast appeals.

II.

We review a district court's grant of summary judgment de novo. United States ex. rel. Glass v. Medtronic, Inc., 957 F.2d 605, 607 (8th Cir. 1992). In considering whether to grant summary judgment, a court examines all the "pleadings, depositions,

---

[4]In this regard, Fast argues that Nelson mischaracterized one of their conversations. Fast claims that Nelson asked how things were going in his job, and he responded "fine." Fast claims that Nelson thereafter took his statement out of context to suggest that he had no new ideas for making MGE a more efficiently-run company.

5

answers to interrogatories . . . admissions on file . . . [and] affidavits." Fed. R. Civ. P. 56(c). Summary judgment is appropriate only where there is "no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Langley v. Allstate Ins. Co., 995 F.2d 841, 844 (8th Cir. 1993) (citations omitted).

Fast argues that MGE discriminated against him because of his age in violation of both federal and Missouri law. We analyze Fast's federal age discrimination claim and his MHRA claim under the same standard. See Finley v. Empiregas, Inc., 975 F.2d 467, 473 (8th Cir. 1992) (decisions under federal employment discrimination statutes are authoritative and applicable under the MHRA as well as federal law) (citations omitted). It is unlawful under the ADEA for an employer to discharge an employee because of his or her age. See 29 U.S.C. § 623(a)(1). The protected age group consists of those age forty or older. Id. § 631(a).

Under the ADEA, a plaintiff may demonstrate age discrimination by either direct or indirect evidence. See Beshears v. Asbill, 930 F.2d 1348, 1353 (8th Cir. 1991) (citation omitted). When a plaintiff puts forth direct evidence that an illegal criterion, such as age, was used in the employer's decision to terminate the plaintiff, the burden-shifting standards applied in Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989), as modified by § 107 of the Civil Rights Act of 1991, 42 U.S.C. §§ 2000e-2(m), are applied. See Browning v. President Riverboat Casino-Missouri, Inc., 139 F.3d 631, 634 (8th Cir. 1998). When a plaintiff has met her burden by providing direct evidence that an employer acted in a discriminatory manner, "'proof that an employer would have made the same employment decision in the absence of discriminatory reasons is relevant to determine not the liability for discriminatory employment practices, but only the appropriate remedy.'" See Wolff v. Brown, 128 F.3d 682, 684 (8th Cir. 1997) (quoting H.R. Rep. No. 102-40(I), at 48 (1991), reprinted in 1991 U.S.S.C.A.N. 549, 586).

When a plaintiff is unable to put forth direct evidence of age discrimination, the Title VII burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), is applicable when analyzing ADEA claims. See Holley v. Sanyo Mfg., Inc., 771 F.2d 1161, 1164 (8th Cir. 1985). Under the first prong of the McDonnell Douglas, burden-shifting framework, the plaintiff must establish a prima facie case of discrimination. See Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 776 (8th Cir. 1995) (citations omitted). Once a plaintiff has established a prima facie case, the burden of production shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for taking adverse action against the plaintiff. See id. at 776-77 (citations omitted). Thereafter, the burden shifts back to the plaintiff to show that the employer's explanation is actually a pretext for discrimination. See id. at 777 (citation omitted). The burden of persuasion remains with the plaintiff at all times. Id.

In differentiating between direct and indirect evidence of age discrimination, we must, in part, distinguish "[c]omments which demonstrate a 'discriminatory animus in the decisional process'" from "'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process.'" Beshears, 930 F.2d at 1354 (citations omitted). See also Radabaugh v. Zip Feed Mills, Inc., 997 F.2d 444, 449 (8th Cir. 1993).

On appeal, both parties argue that this is a pretext case and we treat it accordingly. We note, however, "that a plaintiff may, in some instances, prove intentional discrimination by relying on the evidence proffered to establish his or her prima facie case under the burden-shifting method." Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1208 (8th Cir. 1997) (citing Hicks, 509 U.S. at 511).

There is significant dispute between the parties whether this case should be analyzed under the more exacting standards applied in RIF cases or whether it should be analyzed as a "replacement" case. Having carefully reviewed the record, we find

7

that there were sufficient personnel changes in Fast's department warranting that this action be analyzed as a RIF case.

In order to establish a prima facie case of age discrimination in the RIF context, Fast must show: (1) he is age forty or older; (2) he met the applicable job qualifications; (3) he was discharged; and (4) age was a factor in the employer's decision to terminate him. Reynolds v. Land O'Lakes, Inc., 112 F.3d 358, 361 (8th Cir. 1997) (citations omitted). In a non-RIF age discrimination case, a plaintiff may satisfy the fourth prong of his or her prima facie case by showing that an employee below age forty was hired to replace the plaintiff or the position in question remained open. Bialas v. Greyhound Lines, Inc., 59 F.3d 759, 763 (8th Cir. 1995). In a RIF case, however, "the fact that the plaintiff's duties were assumed by a younger person is not enough in itself to establish a prima facie case." Id. (citation omitted). In meeting his burden under the fourth prong, Fast must "come forward with additional evidence that age was a factor in his termination." Id. (citations omitted).

Southern Union concedes that Fast has satisfied the first three prongs of his prima facie case. We must therefore determine whether Fast has come forward with additional evidence that age was a factor in his termination. The district court found that Kelley's comments were irrelevant in this determination because Nelson, not Kelley, was the ultimate decisionmaker. The district court also found that comments attributable to Nelson should be discounted because some of them were part of Fast's attorney-assisted affidavit and others did not show age discrimination.

Southern Union cites Bialas, and Frieze v. Boatmen's Bank of Belton, 950 F.2d 538 (8th Cir. 1991), to support its position that comments attributable to Kelley, a nondecisionmaker, were irrelevant. In Bialas, our court held that a company executive's statement referring to one of the plaintiff's eventual replacement as "a young man"; the company CEO's statement that anyone at the company for more than ten years was an "idiot"; and the CEO's statement that some managers, including

8

those over forty-five years old, have serious difficulty adjusting to change,[5] were insufficient to show that age factored into the decision to terminate the plaintiffs. Bialas, 59 F.3d at 763-64. Our court reached this conclusion, in part, because of the fact that those making the challenged statements did not participate in the ultimate termination of any of the plaintiffs. Id.

In Frieze, the plaintiff, a bank employee, argued that comments made four years before he was terminated showed age discrimination. See 950 F.2d at 541. The bank's president allegedly told plaintiff that he "had waited too long . . . to start [his] effort towards becoming president of a bank and [plaintiff] would never make it." Id. An executive and a cashier also told the plaintiff that he was too old and had too little rank to become a bank president. See id. This executive and cashier, in contrast to the bank's president, were nondecisionmakers with regard to plaintiff's termination. See id. The Frieze court held that, although the bank's president terminated the plaintiff, he was not bank president when he made the comment plaintiff found objectionable, and he made the comment in the context of a discussion concerning his and the plaintiff's career objectives. See id. Our court characterized the bank president's comment as a "stray remark" that was "too vague to create a reasonable inference of age discrimination." Id. at 542 (citation omitted).

This case is distinguishable from Frieze and Bialas. Here, there remains a fact question as to whether Kelley's comments motivated Nelson to terminate Fast. Kelley sent a clear message in terms of how he wanted MGE to be run. He allegedly told supervisors, including Nelson, that: "Young blood" was needed, and that MGE would benefit from "a fresh new look"; he preferred a younger work force because older workers tend to "stagnate" and the "older work force was pulling the company down"; he believed "younger workers" were the future of the company; "MGE is a good place

---

[5]The CEO made this statement approximately six months after the last plaintiff was terminated.

9

to work for six or seven years, not over ten"; and he preferred a younger work force because younger workers tended to be "more inquisitive" and have "more energy."

Nelson testified that the Kelley meetings provided her with insight into Kelley's expectations for MGE's supervisors. Within a few months of the meetings, Nelson and MGE made significant personnel changes, like terminating Fast. In this regard, the record indicates that, both within and outside Fast's department, all terminated managers were over age forty and/or had significant tenure at the company.

We cannot say as matter of law that no reasonable jury could find that Kelley's comments motivated Nelson to terminate Fast, particularly in light of the fact that, despite his thirty years of service, Nelson failed to review Fast's personnel file or his performance evaluations before terminating him. After carefully reviewing the record, a "jury could . . . reasonably infer that [Nelson] formed her judgment about [Fast] on the basis of the discriminatory comments frequently made by [Kelley], . . . and acted on them by terminating him." Ryther v. KARE 11, 108 F.3d 832, 843 (8th Cir. 1997) (en banc).

Assuming, *arguendo*, that Kelley's comments were unrelated to the decisional process or were "stray remarks," his comments, coupled with those of Nelson, raise

genuine issues of material fact as to whether Nelson terminated Fast because of his age.[6] According to the record, Nelson warned Fast that Southern Union should not be

---

[6]In <u>Bevan v. Honeywell, Inc.</u>, 118 F.3d 603 (8th Cir. 1997), Judge Hansen provided a thorough statement differentiating between stray remarks and remarks made by a supervisor that affect the decisional process. <u>See</u> <u>id.</u> at 610. He explained that although stray remarks, standing alone, would fail to raise an inference of age discrimination, "[i]n a pretext case, . . . such comments are 'surely the kind of fact which could cause a reasonable trier of fact to raise an eyebrow,' <u>MacDissi v. Valmont Indus., Inc.</u>, 856 F.2d 1054, 1058 (8th Cir. 1988), thus providing 'additional threads of evidence,' <u>Morgan v. Arkansas Gazette</u>, 897 F.2d 945, 951 (8th Cir. 1990), that are 'relevant to the jury.'" <u>Id.</u> (quoting <u>Ryther</u>, 108 F.3d at 844.)

viewed as a place for ultimate retirement and MGE was making room for a new generation of leadership with the energy and motivation to get the job done. The record also shows that Nelson warned Fast that Southern Union needed to weed out stagnation in its management and "bring in new, younger people with fresh ideas." In addition to allegedly coming to the false conclusion that just because one is young means one has new, fresh ideas, Nelson allegedly referred to Fast as "overhead."[7] The fact that Nelson hired Miller, then thirty-three years old, to assume many of the same job responsibilities as Fast, is not, standing alone, sufficient to establish a prima facie case in the RIF context. See Holley, 771 at 1167. Nonetheless, this fact, coupled with other evidence that age was a factor in Fast's termination, supports Fast's age discrimination claim.

"In recognition that a RIF is a legitimate[,] [nondiscriminatory] reason for termination," Fast was required to come forward with additional proof that age was a factor in Southern Union's decision to terminate him. Hardin v. Hussman Corp., 45 F.3d 262, 264 (8th Cir. 1995) (citation omitted). Based on a review of the entire record and the above discussion, Fast has made an additional showing that age was a factor in his termination. Therefore, because there are genuine issues of material fact

---

[7]Southern Union argues that Fast's deposition testimony, taken alone, fails to raise genuine issues of material fact and his affidavit is a sham. We disagree. "[O]nly in circumstances . . . where the conflicts between the deposition and affidavit raise . . . sham issues should summary judgment be granted." Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1366 (8th Cir. 1983). See also RSBI Aerospace, Inc., v. Affiliated FM Ins. Co., 49 F.3d 399, 402 (8th Cir. 1995). Nothing in Fast's affidavit, when compared to his deposition testimony, leads to the conclusion that his affidavit was a sham. In his deposition testimony, Fast provided evidence that age may have been a motivating factor in Nelson's decision to terminate him. Rather than contradict his deposition testimony, Fast's affidavit supplements his deposition testimony.

concerning whether MGE discriminated against Fast due to his age and used the RIF as a pretext for age discrimination, we reverse and remand for trial.

## III.

Finally, Fast appeals the district court's denial of his motion to amend his witness list. "Orders by a district court denying or limiting discovery . . . will not be reversed unless there has been a clear abuse of discretion." Dabney v. Montgomery Ward & Co., 761 F.2d 494, 498 (8th Cir. 1985) (citation omitted). Fast argues that the district court abused its discretion because Southern Union purposefully withheld names of witnesses central to Fast's case. Fast claims that one month before the trial date, he discovered three new witnesses who had attended the Kelley meetings and wanted their testimony to be part of the record.

The district court denied Fast's request for two reasons. First, the district court found that the motion was untimely because of Fast's lack of diligence in searching for the witnesses. Second, the court found that because Kelley was not the ultimate decisionmaker and Fast and Carl Morse already testified about Kelley's remarks, any other evidence would be "collateral to the main issue." After reviewing the record, we find that the district court did not abuse its discretion in denying Fast's motion. In light of our opinion, however, Kelley's remarks were not collateral to the main issue and may form a central part of Fast's case. Therefore, on remand, we leave it to the district court's discretion whether to permit Fast to amend his witness list.

## IV.

For the reasons stated above, we reverse the district court's grant of summary judgment in favor of Southern Union and remand for trial on Fast's age discrimination claim. We leave it to the district court's discretion whether to permit Fast to amend his witness list.

A true copy.

Attest.

           CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.