Philip NELSON, Plaintiff,

v.

LONG LINES LTD., a South Dakota Corporation, and Charles Long, in his individual capacity, Defendants.

No. C02–4083–MWB.

United States District Court,
N.D. Iowa,
Western Division.

Sept. 15, 2004.

Michael J. Carroll, Coppola, Sandre, McConville & Carroll, PC, West Des Moines, IA, Steve G. Heikens, Minneapolis, MN, for Plaintiff.

Margaret M. Prahl, Heidman Redmond Fredregill Patterson Plaza Dykstra & Prahl, Sioux City, IA, for Defendants.

**MEMORANDUM OPINION AND OR-DER REGARDING DEFEN-DANTS' MOTION FOR SUMMARY JUDGMENT**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND .....................................950
 A. Procedural Background..........................................950
 B. Factual Background.............................................951

II. LEGAL ANALYSIS .......................................................954
 A. Standards For Summary Judgment ...............................954
 1. Requirements of Rule 56 .................................954
 2. The parties' burdens .....................................954
 3. Summary judgment in employment discrimination cases ..............955
 B. Nelson's ADEA Claim ...........................................956
 1. The direct evidence paradigm ............................956
 2. Nelson's direct evidence .................................958
 a. The speaker .........................................959
 b. The content ........................................959
 c. The causal link.....................................960
 3. The circumstantial evidence paradigm ...................960
 a. Nelson's prima facie case...........................962
 b. Nelson's showing of pretext ........................963
 C. Nelson's Fair Labor Standards Act Claim ......................964
 1. Requirements of FSLA ....................................965
 2. Single enterprise under FSLA............................965
 a. Related activity ...................................965
 b. Common control or unified operations ..............966
 c. Common business purpose............................966
 D. Breach Of Implied Covenant Of Good Faith And Fair Dealing ............967
 E. Promissory Estoppel ..........................................968
 F. Unjust Enrichment.............................................971

III. CONCLUSION ...........................................................972

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On September 19, 2002, Philip Nelson filed a complaint in this court against his former employer, defendant Long Lines, Ltd. ("Long Lines") and Charles Long, the owner of Long Lines, alleging five causes of action: (1) a claim of age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq.; (2) a claim for unpaid overtime compensation under the overtime pay provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; (3) a pendent state law claim for breach of the covenant of good faith and fair dealing; (4) a pendent state law claim for promissory estoppel; and (5) a pendent state law claim for unjust enrichment.

Defendants have filed a Motion for Summary Judgment on all of Nelson's claims. First, in their motion, defendant Long contends that the ADEA claim against him must be dismissed because there is no individual liability for age discrimination under the ADEA. Defendant Long Lines contends that Nelson's ADEA claim must be dismissed because Nelson cannot estab-

lish a *prima facie* case of age discrimination and there is no evidence of pretext sufficient to create a jury issue. With respect to Nelson's FLSA claim, defendant Long Lines asserts that the underlying entity which employed Nelson, Manhattan Beach, Inc., is not an "enterprise engaged in commerce" under the FLSA and therefore the overtime requirements of the FLSA do not apply to it. Alternatively, defendant Long Lines asserts that because of Nelson's supervisory role at the resort, he was not entitled to receive overtime pay. Defendants also seek summary judgment on Nelson's claim of breach of the covenant of good faith and fair dealing during his employment on the ground that this claim is not recognized by Iowa law. Alternatively, defendants contend that the conduct complained of was not bad faith conduct required for such a claim. With regard to Nelson's claim of promissory estoppel, defendants assert that Nelson's proof on this issue must fail as a matter of law because the alleged promise was not sufficiently definite and Nelson's reliance occurred prior to the making of any promise. Finally, defendants seek summary judgment on Nelson's unjust enrichment claim found in Count V on the ground that Nelson was told not to use his personal equipment in the performance of his work duties. Nelson has filed a timely resistance to defendants' Motion for Summary Judgment, arguing that there are genuine issues of material facts in dispute regarding all of his claims.

Subject matter jurisdiction over Nelson's federal claim is proper pursuant to 28 U.S.C. § 1331 (federal question). The court has jurisdiction over the state law claim alleging violations of Iowa common law pursuant to 28 U.S.C. § 1367(a), which confers "supplemental jurisdiction over all claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

## B. Factual Background

The summary judgment record reveals that the following facts are undisputed. Philip Nelson was born on October 3, 1939. In the Spring of 1996, Nelson was hired by Charles ("Chuck") Long to work at Manhattan Beach Resort. At the time, Nelson worked for Village West Resort at Lake Okoboji, Iowa. Nelson had been originally hired by Long Lines, Inc. to work at Village West Resort, which Long Lines owned. Long Lines also owned another resort in the same area, Manhattan Beach Resort. Long Lines is an Iowa corporation whose function is to own the stock of its subsidiary corporations and to handle some administrative functions for them. Long Lines is the sole shareholder of Manhattan Beach, Inc., which was incorporated on November 30, 1999. Prior to that date, Manhattan Beach Resort had been operated as a division of Long Lines. Manhattan Beach, Inc. is a separate corporation from Long Lines and is located at Wapheton, Iowa, about 100 miles from Sergeant Bluff, Iowa, where Long Lines is located. Manhattan Beach, Inc. has never had more than $500,000 in total annual income. Long Lines provided payroll services for Manhattan Beach, Inc. under an arrangement whereby Manhattan Beach reimbursed Long Lines for such services.

In 1996, Long Lines sold Village West Resort. Nelson was told by Long that when the ownership of Village West Resorts was separated from Manhattan Beach Resort that Nelson could work at Manhattan Beach Resort. Manhattan Beach Resort is a resort whose business is to provide recreational housing by renting units to customers. Manhattan Beach Resort is owned by Manhattan Beach, Inc. All of the houses and units at Manhattan Beach Resort were part of the resort prop-

erty, including those occupied by Mr. and Mrs. Chuck Long and his sister. On February 16, 2000, Nelson signed an Employee Acknowledgment Form in which he indicates that he was an at will employee of Long Lines.

Nelson was responsible for taking care of the entire facility. Nelson was designated the resort supervisor, worked without direct supervision, and no one told him what work to do at the resort on a day-to-day basis. Nelson made hiring decisions and determined the number of employees that were needed. He arranged for the placement of advertisements for summer help. Nelson hired two or more employees for the summer season and directed their work by telling them what to do and where he wanted them to work on a daily basis. Nelson kept track of the workers' time and sent the time sheets to the corporate office for processing but he did not fax his hours to Long Lines. Nelson contacted, hired and supervised the cleaning service. He told the cleaning service where they needed to clean. Nelson also monitored the facilities and arranged for service people to make repairs where needed. Nelson contacted the carpet cleaning service each year and obtained towels and bedding from a laundry service. He also made arrangements with a plumber for the installation of drains. In addition, Nelson obtained quotes from contractors for the repair of sidewalks at the resort. On a few occasions, Nelson contacted a tree service to remove trees from the resort. Nelson also looked into the costs for housekeeping staff as part of management's consideration of changing the basis of rentals to nightly or weekly. No one ever told Nelson that he had to work more than eight hours a day and he never requested authorization to hire additional help. Chuck Long believes that he never asked Nelson to do anything that he would not have done himself.

Chuck Long made the decision to fire Nelson, in consultation with his Chief Financial Officer, Tom Grimsley. Charles Long was 58 years of age when he decided to fire Nelson. Grimsley carried out the task of telling Nelson that he was fired. Nelson was 61 years of age at the time of his termination on May 2, 2001. Long's stated reason for firing Nelson was because the resort did not need a manager and because of poor work performance. Nelson remembers that on one occasion, on March 13, 2000, Long asked him his age. After Nelson told Long his age, Long reportedly stated in reply, "[Y]ou probably want to work til you're 65." Nelson Dep. at p. 77. Nelson responded, saying, "[Y]es, I would probably want to do that." Nelson Dep. at p. 77. Neither Long nor anyone else at the resort ever made any other age related comment during Nelson's tenure with Manhattan Beach Resort and Nelson does not recall seeing or receiving any documents or letters that were derogatory of older people. Grimsley decided, with Long's input, not to replace Nelson with another manager but to divide his duties between two people who were already employed at Manhattan Beach Resort. The responsibility for maintenance was assigned to Mick Wilson, who was 57 years old at the time of Nelson's termination, and the management responsibilities, including marketing and guest relations, were assigned to Theresa Grosvenor, who was 37 years old at the time Nelson was fired. Grosvenor is Long's sister-in-law. Nelson bases his belief that age was a motivating factor in the decision to fire him based on Long's asking him his age and that younger workers took over his duties after he was terminated.

During the summer of 2000, Manhattan Beach experienced substantial vacancy rates and was not experiencing satisfactory rates of return. In 1999, Manhattan Beach Resort had total income of

$263,842.00; in 2000, it was $227,238.00.[1] In the fall or winter of 2000, Long told Nelson that he wanted Nelson to separate his tools and equipment from those owned by the resort. By the early spring of 2001, Nelson had not separated his tools and equipment from the resort's, although Long and Grimsley had reminded him to do so.

Manhattan Beach resort operates generally from Memorial Day to Labor Day. The necessary duties of the manager in the off-season should not consume more than one-half time. Nelson accepted an offer of free housing and moved into an apartment at the resort in the spring of 1996. Neither Long Lines nor Chuck Long did anything to make Nelson sell his house and move into this apartment. Nelson was not threatened or coerced into moving into the resort apartment and by doing so he received free housing, utilities, appliances and the use of some of the resort furniture. Nelson did not sell his house until 1999, even though he moved to the resort in 1996 and continued to receive tax deductions for interest and taxes for three years after moving to the resort. Nelson drove a pickup truck provided by the company during his employment. He used the company truck for personal use but also retained his own pickup truck and another vehicle for his personal use.

Nelson did not have a contract that required him to remain on the job and he did not complain or request additional help when he received additional responsibilities. When Chuck Long or his wife asked Nelson to perform tasks, the Longs were never threatening or rude or unkind. Nelson stopped looking for a job in 1989 when he was first hired by Village West and in 1996, when Chuck Long hired him to work at Manhattan Beach Resort.

Nelson purchased equipment and tools for the resort, and when he did so, he submitted the bills to the corporate offices. No one ever told Nelson not to purchase tools for the resort. Nelson used Long Lines's credit and charged equipment to the resort at a location that also made equipment available to rent. At one point, Chuck Long saw Nelson using his own riding lawn mower, which was being stored at the resort, at no cost to Nelson, after Nelson sold his house. Before that, Long was unaware that Nelson acquired and used books, equipment, or tools that he personally owned in his duties at the resort. Long told Nelson not to use his own equipment for resort work. Nelson continued to use his personal mower after being told not to use it.

Nelson did not have any agreement with the resort that he would be paid rent for equipment that he used. He did not at any time ask or report to anyone that he was using his own tools and equipment. Nelson bought a seeder and used it at the resort without telling anyone. He did not bill the resort for its use. Nelson also bought a sprayer after he moved onto the resort property but did not bill the resort for it or for its use. He also bought a pole pruning saw but did not bill the resort for it. Nelson also bought gardening books on his own. He did not submit bills to the company for the books, even though he had previously purchased equipment for which he submitted bills that were paid without protest. Neither Chuck Long nor anyone else at the resort told Nelson to take a gardening course. Nelson's wages were never reduced in the off season.

---

**1.** In 2001, Manhattan Beach Resort had a total income of $294,228.38; and in 2002, it was $345,964.78.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). The essentials of these standards for present purposes are as follows.

### 1. Requirements of Rule 56

Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

### 2. The parties' burdens

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston,* 133 F.3d at 1107; *Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Rather, the party opposing summary judgment is required under Rule 56(e) to go beyond the plead-

ings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same).

### 3. *Summary judgment in employment discrimination cases*

 Because this is an employment discrimination case, it is well to remember that the Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.,* 827 F.2d 363, 364 (8th Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Snow v. Ridgeview Medical Ctr.,* 128 F.3d 1201, 1205 (8th Cir.1997) (citing *Crawford* ); *Helfter v. United Parcel Serv., Inc.,* 115 F.3d 613, 615 (8th Cir. 1997) (quoting *Crawford* ); *Chock v.*

*Northwest Airlines, Inc.,* 113 F.3d 861, 862 (8th Cir.1997) ("We must also keep in mind, as our court has previously cautioned, that summary judgment should be used sparingly in employment discrimination cases," citing *Crawford* ); *Smith v. St. Louis Univ.,* 109 F.3d 1261, 1264 (8th Cir. 1997) (quoting *Crawford* ); *Hardin v. Hussmann Corp.,* 45 F.3d 262 (8th Cir. 1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.,* 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand,* 827 F.2d at 364). Summary judgment is appropriate in employment discrimination cases only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson,* 931 F.2d at 1244; *see also Webb v. St. Louis Post–Dispatch,* 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson,* 931 F.2d at 1244); *Crawford,* 37 F.3d at 1341 (quoting *Johnson,* 931 F.2d at 1244). To put it another way, "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Crawford,* 37 F.3d at 1341 (holding that there was a genuine issue of material fact precluding summary judgment); *accord Snow,* 128 F.3d at 1205 ("Because discrimination cases often turn on inferences rather than on direct evidence, we are particularly deferential to the nonmovant," citing *Crawford* ); *Webb v. Garelick Mfg. Co.,* 94 F.3d 484, 486 (8th Cir.1996) (citing *Crawford,* 37 F.3d at 1341); *Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995) (quoting *Crawford,* 37 F.3d at 1341); *Johnson,* 931 F.2d at 1244.

 However, the Eighth Circuit Court of Appeals also observed that, "[a]lthough summary judgment should be used spar-

ingly in the context of employment discrimination cases, *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994), the plaintiff's evidence must go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir.1995) (citing *Reich v. Hoy Shoe Co.,* 32 F.3d 361, 365 (8th Cir.1994)); *accord Kiel v. Select Artificials, Inc.,* 169 F.3d 1131, 1134 (8th Cir.) (observing that the burden-shifting framework of *McDonnell Douglas* must be used to determine whether summary judgment is appropriate), *cert. denied,* 528 U.S. 818, 120 S.Ct. 59, 145 L.Ed.2d 51 (1999). In *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court reiterated that " '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.' " *Reeves,* 530 U.S. at 142, 120 S.Ct. 2097 (quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).[2] Thus, what the plaintiff's evidence must show, to avoid summary judgment or judgment as a matter of law, is " '1, that the stated reasons were not the real reasons for [the plaintiff's] discharge; and 2, that age [or race, or sex, or other prohibited] discrimination was the real reason for [the plaintiff's] discharge." *Id.* at 153, 120 S.Ct. 2097 (quoting the district court's jury instructions as properly stating the law). The Supreme Court clarified in *Reeves* that, to meet this burden, "a plaintiff's prima facie case, combined with

sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148, 120 S.Ct. 2097 (emphasis added). The court will apply these standards to defendants' Motion for Summary Judgment.

### B. Nelson's ADEA Claim

■ Under the ADEA, it is unlawful for an employer to "fail to hire or to discharge any individual or otherwise discriminate against any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). An ADEA claim can arise either as a pretext claim, as a mixed motives claim, or as a reduction in force ("RIF") claim. *Spencer v. Stuart Hall Co.,* 173 F.3d 1124, 1127 (8th Cir.1999). Each of these types of ADEA claim has slightly different elements. *Id.* (citing *Bevan v. Honeywell, Inc.,* 118 F.3d 603, 609 n. 1 (8th Cir.1997)). Here, defendants argue that Nelson has no direct evidence of age discrimination, just a single stray remark regarding Nelson's age and retirements plans, made a year before Nelson's employment was terminated. Nelson, on the other hand, counters he has direct evidence of discrimination in the form of a question from Chuck Long on March 13, 2000, in which Long asked Nelson how old he was. After Nelson told Long his age, Long reportedly stated in reply, "[Y]ou probably want to work til you're 65." Nelson Dep. at p. 77.

### 1. The direct evidence paradigm

■ A plaintiff asserting employment discrimination on the basis of age or some

---

**2.** In *Reeves,* the Supreme Court was considering a motion for judgment as a matter of law *after* a jury trial, but the Supreme Court also reiterated that "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.' " *Reeves,*

530 U.S. at 150, 120 S.Ct. 2097 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Therefore, the standards articulated in *Reeves* are applicable to the present motion for summary judgment.

other protected characteristic must make out a surmisable case "under either the direct evidence framework of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or the indirect evidence, burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Breeding v. Arthur J. Gallagher & Co.,* 164 F.3d 1151, 1156 (8th Cir.1999).[3] As the court of appeals instructed:

> "When a plaintiff puts forth direct evidence that an illegal criterion, such as age [or sex], was used in the employer's decision to terminate the plaintiff," we apply the standards enunciated in *Price Waterhouse v. Hopkins,* as modified by § 107 of the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2(m). *Fast v. Southern Union Co.,* 149 F.3d 885, 889 (8th Cir. 1998). Under this modified *Price Waterhouse* standard, a defendant is liable for discrimination upon proof by direct evidence that an employer acted on the basis of a discriminatory motive, and proof that the employer would have made the same decision absent the discriminatory motive is only relevant to determining the appropriate remedy. *See id.*

*Breeding,* 164 F.3d at 1156.

Here, defendants contend that Nelson falters on the first step under the *Price Waterhouse* paradigm, because he has failed to present any direct evidence that defendants acted on the basis of a discriminatory motive.

The Eighth Circuit Court of Appeals has considered what constitutes "direct evidence" under the *Price Waterhouse* paradigm in a number of recent decisions. " 'In differentiating between direct and indirect evidence of age discrimination, we must, in part, distinguish comments which demonstrate a discriminatory animus in the decisional process from stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process.' " *Breeding,* 164 F.3d at 1157 (quoting *Fast,* 149 F.3d at 889, with internal quotation marks and citations omitted, as in *Breeding* ). The Eighth Circuit Court of Appeals has also explained "direct evidence," in the context of sex discrimination, as follows:

> Direct evidence is evidence of conduct or statements by persons involved in the decisionmaking process that is sufficient for a factfinder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision. *See Browning v. President Riverboat Casino–Missouri, Inc.,* 139 F.3d 631, 634 (8th Cir.1998). Such evidence might include proof of an admission that gender was the reason for an action, discriminatory references to the particular employee in a work context, or stated hostility to women being in the workplace at all. *Compare id.* at 635; *Stacks v. Southwestern Bell,* 27 F.3d 1316, 1323

---

**3.** Plaintiff Nelson has not asserted the applicability of *Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), in this case. In *Desert Palace,* the United States Supreme Court unanimously held that in the context of Title VII, as amended by Congress in 1991, "direct evidence of discrimination is not required in mixed-motive[s] cases...." *Id.* at 100, 123 S.Ct. 2148. The *Desert Palace* opinion focused exclusively on the language of the 1991 amendments to Title VII. As a result, *Desert Palace* is limited to cases under Title VII and arguably does not apply to other discrimination statutes, such as the ADEA. However, the court notes that the Fifth Circuit Court of Appeals has held that *Desert Palace* applies to ADEA claims. *Rachid v. Jack In The Box, Inc.,* 376 F.3d 305, 310 (5th Cir.2004). Here, because Nelson has not asserted *Desert Palace's* applicability here, the court has no occasion to rule upon its applicability to ADEA claims.

(8th Cir.1994) *with Rivers–Frison v. Southeast Mo. Community Treatment Ctr.,* 133 F.3d 616, 619 (8th Cir.1998). Kerns relies on evidence that Castiglioni made sexist and sexual comments and that the company was aware of at least some of these. None of the statements related either to Kerns herself or the abilities of women employees, however. There is no direct evidence that Castiglioni took disciplinary actions against Kerns because she is female, and therefore the *McDonnell Douglas* analysis should be used rather than the mixed motive test of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 248–50, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

*Kerns v. Capital Graphics, Inc.,* 178 F.3d 1011, 1017 (8th Cir.1999); *accord E.E.O.C. v. Liberal R–II Sch. Dist.,* 314 F.3d 920, 923 (8th Cir.2002); *Erickson v. Farmland Indus., Inc.,* 271 F.3d 718, 724 (8th Cir. 2001); *Yates v. Douglas,* 255 F.3d 546, 548 (8th Cir.2001); *Walton v. McDonnell Douglas Corp.,* 167 F.3d 423, 426 (8th Cir. 1999).

■ The Eighth Circuit Court of Appeals further observed that:

"Not all comments that may reflect a discriminatory attitude are sufficiently related to the adverse employment action in question to support such an inference." *Walton v. McDonnell Douglas Corp.,* 167 F.3d 423, 426 (8th Cir.1999). Stray remarks made in the workplace are not sufficient to establish a claim of discrimination. *See Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir.1991) (quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775).

*Simmons v. Oce–USA, Inc.,* 174 F.3d 913, 915–16 (8th Cir.1999); *accord Walton,* 167 F.3d at 426. Where comments are not "close in time" to an adverse employment decision, the plaintiff "must establish a causal link between the comments and his [or her] termination." *Simmons,* 174 F.3d at 916 (citing *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 779 (8th Cir.1995)); *see also Walton,* 167 F.3d at 426–27 (even if a comment might evidence discriminatory animus in some context, if the comment is distant in time from adverse action, and there is no evidence of a "causal link" between the comment and the decisional process leading to the adverse action, a direct evidence claim fails). "Absent a causal link between the [derogatory] comments and the adverse employment decision, [the speaker's] derogatory language is best classified as 'statement[s] by [a] decisionmaker[ ] unrelated to the decisional process.'" *Simmons,* 174 F.3d at 916 (quoting *Rivers–Frison v. Southeast Mo. Community Treatment Ctr.,* 133 F.3d 616, 619 (8th Cir.1998), in turn quoting *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775); *McKay v. United States Dep't of Transp.,* 340 F.3d 695, 700 (8th Cir.2003) (holding that plaintiff failed to present sufficient direct evidence of age discrimination through manager's statements about retired airline pilots where there was insufficient evidence that manager was involved in making decision in question); *Walton,* 167 F.3d at 426 ("For example, 'stray remarks in the workplace,' 'statements of nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself' will not suffice.") (some internal quotation marks omitted); *Breeding,* 164 F.3d at 1157 (comments that were "not related to the decisional process" were not sufficient).

## 2. *Nelson's direct evidence*

■ Nelson relies exclusively on two questions made by his direct supervisor, Chuck Long, on March 13, 2000, as direct evidence that he was terminated because of his age in May of 2001. The initial question by Long at issue here was asking Nelson his age. When Nelson replied that he was 60, Long reportedly stated in reply,

"[Y]ou probably want to work til you're 65." Nelson replied in the affirmative. The case precedents cited above require the court to analyze these comments according to three criteria: (1) the speaker; (2) the content; and (3) the causal connection between the comments and the adverse employment decision.

### a. The speaker

The court turns first to the identity of the "speaker" of the comments allegedly constituting direct evidence of discrimination, because, as noted above, "[d]irect evidence is evidence of conduct or statements by persons involved in the decisionmaking process." *Kerns,* 178 F.3d at 1017; *Simmons,* 174 F.3d at 915; *Walton,* 167 F.3d at 426. The statements purportedly constituting direct evidence of age discrimination in this case are attributed to Chuck Long, Nelson's immediate supervisor. It is uncontested that Long was a person involved in the decisionmaking process that led to Nelson's termination.

### b. The content

Next, the court turns to the content of the questions specifically identified by Nelson as his "direct evidence" of discrimination. This criterion is obviously relevant, because "[d]irect evidence is evidence of conduct or statements by persons involved in the decisionmaking process *that is sufficient for a factfinder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision."* *Kerns,* 178 F.3d at 1017 (emphasis added). Although Nelson asserts that Long's questions reflect an age-based discriminatory animus, the court concludes that the questions alleged are so innocuous that they fail to raise even a jury question as to whether "a discriminatory attitude was more likely than not a motivating factor in the employer's decision," *id.,* and hence summary judgment on Nelson's "direct evidence" claim is ap-

propriate. FED. R. CIV. P. 56(c) (summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law").

The questions at issue here do not constitute "an admission that [the plaintiff's age] was the reason for an action, discriminatory references to the particular employee in a work context, or stated hostility to [people of the plaintiff's age] being in the workplace at all." *See Kerns,* 178 F.3d at 1017 (cast in terms of gender in the original). Although the comments may have related to Nelson himself, they certainly do not relate to the abilities of older employees. *See id.; Walton,* 167 F.3d at 427 (comments did not show discriminatory animus, because they could not "reasonably be understood as derogatory toward older employees generally"). Indeed, the court concludes that a reasonable jury would more likely than not find the questions entirely innocuous; certainly, they are far from "sufficient for a factfinder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Walton,* 167 F.3d at 427. It would seem that questions about one's age and the age they wish to retire are the standard fare of casual conversations among employees of all ages. Far more pointed inquiries about an older employee's retirement plans have been held not to constitute age discrimination. For example, in *Montgomery v. John Deere & Co.,* 169 F.3d 556 (8th Cir.1999), the court held that the fact that an employee was regularly offered early retirement does not by itself violate the ADEA, because an employer may make reasonable inquiries into retirement plans of its employees and a plaintiff should not be able to rely on those inquiries to prove intentional discrimination, unless the inquiries are so unnecessary and excessive as to constitute evidence of discriminatory in-

tent. *Montgomery,* 169 F.3d at 560; *see also Burns v. AAF–McQuay, Inc.,* 166 F.3d 292, 295 (4th Cir.1999) (on a hostile environment age discrimination claim, the court held that comments including inquiry about the plaintiff's retirement plans, comments that the plaintiff was acting like a child, and comments that the plaintiff did not fit in with the employer's group, were "scant [in] number and generally mild [in] nature," and therefore insufficient to establish an objectively hostile environment). The court in *Montgomery* also rejected the sufficiency of far more pointed references to the plaintiff's age, holding that repeated references to the plaintiff by his supervisor and others as "old fart" were not a sufficient basis for an inference of age discrimination. *See id.* (citing *Ryther v. KARE 11,* 108 F.3d 832, 842–44 (8th Cir.), *cert. denied,* 521 U.S. 1119, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997), a "pretext" case, in which similar comments were held to be insufficient to raise an inference of age discrimination).

Thus, the court concludes that defendants are entitled to summary judgment on Nelson's "direct evidence" claim, because Nelson has failed to present any "direct evidence" of discriminatory animus.

### c. The causal link

■■■■ Even if there is some sinister age-discriminatory animus lurking in a casual inquiry about one's age and when one wishes to retire, Nelson has also failed to generate a genuine issue of material fact that the comments in question here bear the necessary causal connection to the adverse employment decision fourteen months later. Again, "[n]ot all comments that may reflect a discriminatory attitude are sufficiently related to the adverse employment action in question to support . . . an inference [of discriminatory intent]." *Walton,* 167 F.3d at 426; *see also Simmons,* 174 F.3d at 915 (quoting *Walton* ). Where, as here, comments are not "close

in time" to an adverse employment decision, the plaintiff "must establish a causal link between the comments and his [or her] termination." *Id.* at 916 (citing *Hutson,* 63 F.3d at 779); *see also Walton,* 167 F.3d at 426–27.

Nelson has not attempted to forge such a "causal link" between Long's questions and the decision to terminate him fourteen months later. The court notes that Long's questions were made casually, in passing, on the order of inquiries about what Nelson was going to have for dinner that night. At most, Nelson has presented " 'statement[s] by [a] decisionmaker[ ] unrelated to the decisional process.' " *Simmons,* 174 F.3d at 916 (quoting *Rivers– Frison,* 133 F.3d at 619). Therefore, defendants are entitled to summary judgment that Nelson has not presented any "direct evidence" of age discrimination, and thus cannot proceed under the *Price Waterhouse* paradigm, or obtain the relief that would flow from proof of mixed motives for Nelson's termination. *See Breeding,* 164 F.3d at 1156.

### 3. The circumstantial evidence paradigm

■■■ Where there is no direct evidence of discrimination, the *McDonnell Douglas* analysis should be used rather than the mixed motive test of *Price Waterhouse v. Hopkins. See Kerns,* 178 F.3d at 1017; *Simmons,* 174 F.3d at 916 (where the plaintiff failed to establish direct evidence of discrimination, the case was analyzed in the alternative under the *McDonnell Douglas* "circumstantial evidence" paradigm); *Breeding,* 164 F.3d at 1156 (same).

■■■ Under *McDonnell Douglas* and its progeny, the employment discrimination plaintiff has the initial burden of establishing a *prima facie* case of discrimination by producing evidence that would entitle the plaintiff to prevail unless contradicted and

overcome by evidence produced by the defendant. *Tuttle*, 172 F.3d at 1029; *White v. McDonnell Douglas Corp.*, 985 F.2d 434, 435 (8th Cir.1993). "Once established, the prima facie case entitles the plaintiff to a rebuttable presumption that intentional discrimination played a role in the adverse employment action." *Hutson*, 63 F.3d at 776; *accord Tuttle*, 172 F.3d at 1029; *Krenik v. County of Le Sueur*, 47 F.3d 953, 958 (8th Cir.1995); *Kobrin v. University of Minn.*, 34 F.3d 698, 702 (8th Cir.1994).

▮▮▮ If a *prima facie* case is established, the burden then shifts to the employer to rebut the presumption by producing evidence that the employer made the questioned employment decision for a legitimate, non-discriminatory reason. *Tuttle*, 172 F.3d at 1029; *White*, 985 F.2d at 435. The employer's explanation of its actions must be "clear and reasonably specific," *Burdine*, 450 U.S. at 258, 101 S.Ct. 1089, but the employer's burden of production has nonetheless been held to be "exceedingly light." *Batey v. Stone*, 24 F.3d 1330, 1334 (11th Cir.1994) (citing *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir.1994)). If the employer meets this burden of production, the legal presumption that would justify a judgment as a matter of law based on the plaintiff's *prima facie* case "simply drops out of the picture," and the plaintiff bears the burden of persuading the finder of fact that the proffered reasons are pretextual and that the employment decision was the result of discriminatory intent. *St. Mary's*, 509 U.S. at 510, 113 S.Ct. 2742.

▮▮▮ The Supreme Court has made clear that the ultimate inquiry is whether the employer intentionally discriminated against the plaintiff. *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *Tuttle*, 172 F.3d at 1029; *United States v. Johnson*, 28 F.3d 1487, 1494 (8th

Cir.1994), *cert. denied*, 513 U.S. 1098, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995). However, if the defendant's proffered reasons are rejected, the trier of fact may infer the ultimate fact of intentional discrimination. *St. Mary's*, 509 U.S. at 510, 113 S.Ct. 2742 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."); *Harvey v. Anheuser–Busch, Inc.*, 38 F.3d 968, 971 (8th Cir.1994) (quoting *St. Mary's*, 509 U.S. at 510, 113 S.Ct. 2742).

▮▮▮ The importance of the *prima facie* showing is that it creates the inference that the employer terminated the plaintiff for an impermissible reason. *Hardin*, 45 F.3d at 264. However, as was pointed out above, the *prima facie* case criteria differ for each type of employment decision. *Spencer*, 173 F.3d at 1127; *Davenport*, 30 F.3d at 944. Thus, in a case alleging age discrimination, the usual elements of the *prima facie* case are: (1) that the plaintiff was a member of a protected group on the basis of his or her age; (2) that the plaintiff was performing his or her job at a level that met the employer's legitimate expectations; (3) that plaintiff was discharged; and (4) that the employer replaced or attempted to replace the plaintiff with a younger person. *See Montgomery v. John Deere & Co.*, 169 F.3d 556, 559 (8th Cir.1999); *Vaughn v. Roadway Express, Inc.*, 164 F.3d 1087, 1089 (8th Cir. 1998); *Ziegler v. Beverly Enters.-Minn., Inc.*, 133 F.3d 671, 675 (8th Cir.1998); *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 776 (8th Cir.1995); *Rinehart v. City of Independence, Mo.*, 35 F.3d 1263, 1265–66 (8th Cir.1994) *Radabaugh*, 997 F.2d at 447; *Beshears*, 930 F.2d at 1353;

*see also O'Connor v. Consolidated Coin Caterers, Inc.,* 517 U.S. 308, 310, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (in an ADEA case, in order to establish a *prima facie* case it is not necessary that the plaintiff be replaced with a person from outside the protected class, only that the plaintiff be replaced by a younger person). However, as this case involves a discharge in the context of a reorganization, a further modification of the *prima facie* case is necessary. In the context of a reduction in force, the fourth element of the *McDonnell Douglas prima facie* case cannot be shown because the position is not filled by another or left open, but eliminated or combined with another position. *Hardin,* 45 F.3d at 264; *Hillebrand,* 827 F.2d at 364. Thus, " 'the fact that the plaintiff's duties were assumed by a younger person is not enough in itself to establish a prima facie case.' " *Fast v. Southern Union Co.,* 149 F.3d 885, 890 (8th Cir.1998) (quoting *Bialas v. Greyhound Lines, Inc.,* 59 F.3d 759, 763 (8th Cir.1995)). Accordingly, the Eighth Circuit Court of Appeals held that the plaintiff in a reduction in force case to establish a *prima facie* case of age discrimination must show (1) that he was in the protected age group; (2) that he satisfied the applicable job qualifications; (3) that he was discharged; and (4) produce some additional showing that age was a factor in his termination. *See Yates v. Rexton, Inc.,* 267 F.3d 793, 799 (8th Cir. 2001); *Taylor v. QHG of Springdale, Inc.,* 218 F.3d 898, 899 (8th Cir.2000); *Spencer,* 173 F.3d at 1128; *Tuttle,* 172 F.3d at 1029; *Reynolds v. Land O'Lakes, Inc.,* 112 F.3d 358, 361 (8th Cir.1997); *Cramer v. McDonnell Douglas Corp.,* 120 F.3d 874, 876 (8th Cir.1997); *Herrero v. St. Louis Univ. Hosp.,* 109 F.3d 481, 483–84 (8th Cir.1997); *Hutson,* 63 F.3d at 776; *see also Hardin,* 45 F.3d at 264; *Rinehart,* 35 F.3d at 1267–

68; *Thomure v. Phillips Furniture Co.,* 30 F.3d 1020, 1024 (8th Cir.1994), *cert. denied,* 513 U.S. 1191, 115 S.Ct. 1255, 131 L.Ed.2d 135 (1995); *Bashara v. Black Hills Corp.,* 26 F.3d 820, 823 (8th Cir. 1994).

### a. Nelson's prima facie case

 Here, defendants' Motion For Summary Judgment challenges the fourth element in Nelson's *prima facie* case and, alternatively, his evidence of pretext. As noted above, in order to establish the fourth element of a prima facie case of age discrimination, Nelson must provide additional evidence that age played a role in his termination. Nelson claims as additional evidence: (1) Long's asking him about his age in the spring of 2000; (2) the employees who were retained were all younger than him; and (3) Nelson was the second oldest employee at Long Lines.[4] Although Nelson contends these facts are additional evidence of age discrimination, upon review of the record, the court concludes that these facts do not establish that age played a role in the termination process. First, as noted above, Long's questions occurred fourteen months prior to the decision to terminate Nelson and were made casually, in passing. Thus, the court concludes that the questions were unrelated to the decisional process. While it is uncontested that Nelson was older than either of the two employees who were retained, this fact does not establish that age played a role in the termination process. Typically, the additional evidence requirement is not a significant hurdle for an employment discrimination plaintiff. *Yates,* 267 F.3d at 799. However, the circumstances must be such that a factfinder may reasonably infer intentional discrimination. *Hutson v. McDonnell Douglas Corp.,* 63 F.3d 771, 779 (8th Cir.

---

4. The court notes that Nelson has not directed the court to anything in the record which would establish this fact.

1995). Without anything more to substantiate Nelson's assertion, the court is unable to make this inference here. Accordingly, the court finds Nelson has failed to establish a *prima facie* case of age discrimination under the ADEA.

### b. Nelson's showing of pretext

Even if the court assumes, for the sake of argument, Nelson has established a *prima facie* case, Nelson has failed to establish the pretextual nature of defendants' offered reasons. Assuming the *prima facie* case is established, the burden shifts to defendants to provide legitimate nondiscriminatory reasons for its employment decision. *Yates*, 267 F.3d at 799. Here, defendants assert that Long decided to terminate Nelson for poor performance and because the resort no longer needed a manager. Both reasons constitute legitimate, non-discriminatory reasons for defendants' actions. It is reasonable for a company, involved in a reduction in force, to eliminate positions which are easily assumed by existing employees in order to improve efficiency. Because defendants have articulated legitimate, non-discriminatory reasons for their actions, "the plaintiff must then demonstrate that the employer's stated reason is pretextual and that the real reason for the employer's adverse employment action was unlawful age or sex discrimination." *Breeding*, 164 F.3d at 1157. Thus, as in *Simmons*, the court's assumption that the plaintiff has presented a *prima facie* case of discrimination, and its finding that the employer has articulated a legitimate, non-discriminatory reason for its action, "le[aves] us with the question whether [the plaintiff] presented sufficient evidence of pretext to survive summary judgment." *Simmons*, 174 F.3d at 916.

To overcome the employer's proffered legitimate reason, the employee must do more than assert that a jury might disbelieve the employer's proffered reason; the employee " 'must present affirmative evidence' " that discrimination is the reason for the adverse employment action. *See Walton*, 167 F.3d at 428 (quoting *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505). Thus, Nelson is required to come forward with something more than his *prima facie* case to establish pretext. Nelson returns to Long's questions as his primary evidence that his age was the reason for his termination.

Just as "stray remarks" are not "direct evidence" of discrimination, "[s]tray remarks 'that are remote in time do not support a finding of pretext for intentional discrimination.' " *Simmons*, 174 F.3d at 916; *Walton*, 167 F.3d at 428; *Hutson*, 63 F.3d at 778–79. The court found above that Long's questions were unrelated to the decisional process, and thus cannot suffice as Nelson's additional showing to demonstrate pretext. *See Simmons*, 174 F.3d at 916 ("Given the comprehensive objective evidence presented by Oce of Simmons's poor job performance, the offensive remarks made by Curless outside of the decision making process, without more, are not enough to 'create a trialworthy issue' of pretext.").

Nelson also relies on the fact that Grosvenor, who was 37 years old, was hired only a month before his discharge and that she was subsequently assigned some of his duties upon his termination. Grosvenor, who is Chuck Long's sister-in-law, was hired to do advertising and sales for the resort, responsibilities separate from those performed by Nelson. Although Grosvenor was assigned some of the managerial duties which had been performed by Nelson prior to his termination, she did not replace Nelson as general manager of the resort. Thus, there is nothing in Grosvenor's hiring that betrays an illegal animus on the part of defendants.

Even assuming Nelson had raised a genuine issue of material fact as to pretext, "a trial judge [is allowed] to decide on a motion for summary judgment that the evidence is insufficient for a reasonable trier of fact to infer discrimination even though the plaintiff may have created a factual dispute. as to the issue of pretext." *Rothmeier*, 85 F.3d at 1335. In *Simmons*, the court observed,

> [B]ecause Simmons has presented no affirmative evidence that his termination was for other than performance-based reasons, the grant of summary judgment as to his claim of retaliatory discharge was also proper. *See Herrero v. St. Louis Univ. Hosp.*, 109 F.3d 481, 485 (8th Cir.1997).

*Simmons*, 174 F.3d at 917; *accord Kerns*, 178 F.3d at 1017 ("Kerns has not shown reason to doubt that Castiglioni's disapproval of her work performance motivated the disciplinary steps he took," and there was no other evidence of pretext). Here, Nelson has presented no affirmative evidence that his termination was for other than the lack of need for a full time manager and that Long had become dissatisfied with Nelson's work performance.

Thus, "[a]lthough summary judgment should be used sparingly in the context of employment discrimination cases," Nelson's evidence does not "go beyond the establishment of a prima facie case to support a reasonable inference regarding the alleged illicit reason for the defendant's action." *Landon*, 72 F.3d at 624. Summary judgment is thus also appropriate on Nelson's claim on the ground that he cannot satisfy the third stage of the *McDonnell Douglas* burden-shifting analysis. Therefore, defendants' Motion For Summary Judgment is granted as to Nelson's ADEA claim.[5]

## C. Nelson's Fair Labor Standards Act Claim

Defendants also seek summary judgment on Nelson's claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Nelson asserts that Long Lines owes him an unstated amount of money for overtime compensation that he contends he should have been paid during his employment at Manhattan Beach Resort. Defendants assert that Manhattan Beach Resort is not covered by the overtime requirements of the FLSA because under the FLSA it does not constitute an enterprise engaged in commerce. Defendants alternatively assert that Nelson was an exempt employee under the FLSA's

---

**5.** Alternatively, defendant Long argues that Nelson's ADEA claim against him must be dismissed because the ADEA does not provide for individual liability. Although the Eighth Circuit Court of Appeals has not explicitly decided the issue, the majority of the other federal circuit courts of appeals have uniformly held that the ADEA does not provide for individual liability. *See Medina v. Ramsey Steel Co.*, 238 F.3d 674, 686 (5th Cir.2001) ("[T]he ADEA 'provides no basis for individual liability for supervisory employees.'") (quoting *Stults v. Conoco*, 76 F.3d 651, 655 (5th Cir.1996)); *accord Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313–17 (2d Cir.1995) (no individual liability under Title VII); *Smith v. Lomax*, 45 F.3d 402, 403 n. 4 (11th Cir.1995) (no individual liability under the ADEA);

*Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510, 511 (4th Cir.) (no individual liability under ADEA), *cert denied*, 513 U.S. 1058, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994); *Miller v. Maxwell's Int'l, Inc.*, 991 F.2d 583, 587 (9th Cir.1993) (no individual liability under Title VII or ADEA) (citing *Padway v. Palches*, 665 F.2d 965, 968 (9th Cir.1982)); see also *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404–05 (6th Cir.1997)(interpreting Title VII but also finding the liability schemes under Title VII, the ADEA, and the ADA essentially the same in aspects relevant to this issue). Therefore, the court alternatively grants defendants' Motion for Summary Judgment as to Nelson's ADEA claim against defendant Long on the grounds that the ADEA does not provide for individual liability.

"executive exemption." Specifically, defendants assert that the "sole-charge" exception of 29 C.F.R. § 541.1(e) is applicable to Nelson and that he was therefore exempt from FLSA's overtime requirements under 29 U.S.C. § 213(a)(1).

### 1. Requirements of FLSA

■ FLSA's overtime regulations require employers to compensate an employee who works more than forty hours per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a). Under the FLSA, all non-exempt employees are covered by the protections of the FLSA if they are employed by an enterprise "engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and ... whose annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(i,ii). Thus, if an enterprise meets the gross dollar volume amount, all employees are covered under the FLSA if some employees are (1) engaged in commerce; (2) engaged in the production of goods for commerce; or (3) engaged in handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce.

■ Here, it is clear that Manhattan Beach Resort does not meet the gross volume requirement of subsection ii for the relevant years. In 1999, Manhattan Beach Resort had total income of $263,842.00; in 2000, it was $227,238.00; and, in 2001, it was $294,228.38. Defendants' App. at 6E. Nelson's hope, however, is to combine Long Lines and Manhattan Beach Resort's income figures, thereby exceeding the statutory minimum. The enterprise concept allows the revenues of business entities to be combined to meet the minimum gross

sales amount required by the FLSA. *Patel v. Wargo,* 803 F.2d 632, 635 (11th Cir.1986) ("The legislative history [of the FLSA] clearly states the congressional purpose to expand the coverage of the ACT, i.e., to lump related activities together so that the annual dollar volume test for coverage would be satisfied."). Thus, the question here is whether the companies at issue constitute a single enterprise for the purposes of the FLSA.

### 2. Single enterprise under FLSA

■ " 'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose." 29 U.S.C. § 203(r)(1). To be considered a single enterprise under the FLSA, a business must satisfy three elements. It must (1) perform related activities; (2) under unified operations or common control; and, (3) for a common business purpose. *See Brennan v. Arnheim & Neely, Inc.,* 410 U.S. 512, 518, 93 S.Ct. 1138, 35 L.Ed.2d 463 (1973); *Brock v. Best Western Sundown Motel, Inc.,* 883 F.2d 51, 52 (8th Cir. 8th Cir.1989); *Donovan v. Weber,* 723 F.2d 1388, 1391 (8th Cir.1984); *Brennan v. Plaza Shoe Store, Inc.,* 522 F.2d 843 (8th Cir.1975): *see also Reich v. Bay, Inc.,* 23 F.3d 110, 114 (5th Cir.1994); *Reich v. Gateway Press, Inc.,* 13 F.3d 685, 694 (3d Cir. 1994); *Martin v. Deiriggi,* 985 F.2d 129, 133 (4th Cir.1992); *Cruz v. Chesapeake Shipping, Inc.,* 932 F.2d 218, 229 (3rd Cir.1991); *Donovan v. Easton Land & Development,* 723 F.2d 1549, 1551 (11th Cir.1984).

#### a. Related activity

■ Related activities are those which are "the same or similar," S. REP. No. 145, 87th Cong., 1st Sess. 41, *reprinted in* 1960 U.S.C.C.A.N. 1620 (1961), or are

"auxiliary or service activities." 29 C.F.R. § 779.206(a) (quoting S. Rep. No. 145, 87th Cong., 1st Sess. 41, *reprinted in* 1960 U.S.C.C.A.N. 1620 (1961)). Auxiliary and service activities include generally "all activities which are necessary to the operation and maintenance of the particular business," such as warehousing, bookkeeping, or advertising. 29 C.F.R. § 779.208. When different business entities are involved, the critical inquiry is whether there is " 'operational interdependence in fact.' " *Donovan*, 723 F.2d at 1551(quoting *Brennan v. Veterans Cleaning Serv., Inc.*, 482 F.2d 1362, 1367 (5th Cir.1973)). Entities which provide mutually supportive services to the substantial advantage of each entity are operationally interdependent and may be treated as a single enterprise under the Act. *Dole v. Odd Fellows Home Endowment Bd.*, 912 F.2d 689, 692–93 (4th Cir. 1990) (citing *Donovan*, 723 F.2d at 1551–52); *Veterans Cleaning Serv.*, 482 F.2d at 1366–67.

■■■ Long Lines is a holding company that owns the stock of several subsidiary corporations and handles certain administrative functions for those subsidiary corporations. It handled the payroll for Manhattan Beach, Inc. under an arrangement whereby Manhattan Beach, Inc. reimbursed Long Lines for the payroll expense. Manhattan Beach Resort is solely engaged in owning recreational housing and renting those units to customers at Lake Okoboji, Iowa. Manhattan Beach Resort is owned by Manhattan Beach, Inc. Thus, other than its interest in Manhattan Beach, Inc., Long Lines is not in the business of running a resort. Manhattan Beach, Inc., on the other hand, is exclusively in the resort business. This is not a case where the two corporations are engaged in activities that are the "same or similar", they are not components of the same vertical structure, and neither business serves in an auxiliary or service role with respect to the other. Therefore, the

court concludes that the two corporations are not involved in related activities.

### b. Common control or unified operations

■■ In determining whether there is common control, courts heavily emphasize common ownership. *See, e.g., Reich v. Bay, Inc.*, 23 F.3d 110, 115 (5th Cir.1994); *Donovan v. Easton Land & Dev., Inc.*, 723 F.2d 1549, 1552 (11th Cir.1984). Chuck Long is the Chairman of the Board of Long Lines. Long Lines is the sole shareholder of Manhattan Beach, Inc. Long hired and ultimately fired Nelson. Thus, it is clear that Long Lines, via Chuck Long, had the authority to control personnel decisions for Manhattan Beach, Inc. *See Easton Land*, 723 F.2d at 1552 ("[D]eterminative question is whether a common entity has the power to control the related business operations."). Thus, the court concludes that Long Lines, Inc. and Manhattan Beach, Inc. were under common control.

### c. Common business purpose

Third, the court must consider whether Long Lines and Manhattan Beach, Inc. are engaged in a common business purpose. Activities are performed for a common business purpose if they are "directed toward the same business objective or to similar objectives in which the group has an interest." *See* 29 C.F.R. § 779.213. Although Long Lines and Manhattan Beach, Inc. are under common control, the court concludes that the two corporations do not share a common business purpose. Long Lines functions as a holding company for a variety of different types of corporations while Manhattan Beach, Inc. is solely involved in the running of a resort operation. Thus, the court finds that because Long Lines and Manhattan Beach, Inc. do not share a common business purpose and are

not engaged in related activities that Long Lines and Manhattan Beach, Inc. are not one "enterprise" within the meaning of the FLSA. As a result, the court finds that Manhattan Beach, Inc. does not have the requisite $500,000 in gross receipts during the period of time pertinent to this litigation and thus is not subject to the FLSA. Therefore, defendants' Motion For Summary Judgment on this issue is granted.

### D. Breach Of Implied Covenant Of Good Faith And Fair Dealing

Defendants next seek summary judgment on Nelson's claims under Iowa common law for breach of an implied covenant of good faith and fair dealing. Defendants contend that the Iowa Supreme Court has rejected the claim of breach of an implied covenant of good faith and fair dealing in the employment context. Defendants are correct in their assertion that the Iowa Supreme Court has never recognized such a cause of action in an employment context. *See Fitzgerald v. Salsbury Chem., Inc.,* 613 N.W.2d 275, 281 (Iowa 2000); *Phipps v. IASD Health Servs. Corp.,* 558 N.W.2d 198, 204 (Iowa 1997); *Huegerich v. IBP, Inc.,* 547 N.W.2d 216, 220 (Iowa 1996); *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 281 (Iowa 1995); *Porter v. Pioneer Hi–Bred Int'l, Inc.,* 497 N.W.2d 870, 871 (Iowa 1993); *French v. Foods, Inc.,* 495 N.W.2d 768, 771 (Iowa 1993); *Grahek v. Voluntary Hosp. Coop. Ass'n Of Iowa, Inc.,* 473 N.W.2d 31, 34 (Iowa 1991); *Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 456–57 (Iowa 1989). In *Fogel,* the court found that

> [t]he doctrine stems from the implied duty of good faith and fair dealing recognized in all contracts. *See Restatement (Second) of Contracts 205 (1981).* Applied in the employment context, an employee proving a prima facie case of unjust termination could shift to the employer the burden of proving good faith as a defense. The classic case invoking

such a duty of good faith would be the discharge of a thirty-year employee six months before a pension vests, or the dismissal of an employee for spurning the affections of a co-worker. *See generally Minda & Raab Time for an Unjust Dismissal Statute in New York, 54 Brook.L.Rev. 1137, 1147 (1989); Monge v. Beebe Rubber Co.,* 114 N.H. 130, 131, 316 A.2d 549, 551 (1974).

Only a small handful of states have adopted the doctrine. Although Fogel suggests we adopt the action as a tort, four of the five states that recognize the covenant treat it as a contract-based action. *Hoffman–La Roche, Inc. v. Campbell,* 512 So.2d 725, 738 (Ala.1987) (contract); *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 670, 765 P.2d 373, 389–96, 254 Cal.Rptr. 211, 234–39 (1988) (contract); *Fortune v. National Cash Register, Co.,* 373 Mass. 96, 102, 364 N.E.2d 1251, 1256 (1977) (contract); *Gates v. Life of Montana Ins. Co.,* 196 Mont. 178, 638 P.2d 1063, 1067 (1982) (tort); *Monge,* 114 N.H. at 133, 316 A.2d at 551 (contract). New Hampshire, the leading state recognizing the covenant of good faith, has since limited the action to dismissals that are in violation of public policy.

The majority of jurisdictions that have addressed the covenant have unequivocally rejected it. *See, e.g., Parnar v. Americana Hotels, Inc.,* 65 Haw. 370, 377, 652 P.2d 625, 629 (1982); *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 227, 685 P.2d 1081, 1086 (1984); *Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 569, 335 N.W.2d 834, 838 (1983); *Butterfield v. Citibank of South Dakota,* 437 N.W.2d at 860, (S.D.1989); *Morriss v. Coleman Co., Inc.,* 241 Kan. 501, 738 P.2d 841, 851 (1987); *Sadler v. Basin Elec. Power Co-op.,* 409 N.W.2d 87, 89 (N.D.1987); *Cockels v. Intern. Business Expositions, Inc.,* 159 Mich.App. 30, 36–

37, 406 N.W.2d 465, 468 (1987); *Hunt v. IBM Mid America Employees Fed. Credit Union*, 384 N.W.2d at 858; *Neighbors v. Kirksville College of Osteopathic Medicine*, 694 S.W.2d 822, 824 (Mo.App.1985); *Larrabee v. Penobscot Frozen Foods Inc.*, 486 A.2d 97, 100 (Me.1984).

*Fogel*, 446 N.W.2d at 456–57 (citations omitted). The Iowa Supreme Court has since interpreted *Fogel* as expressly rejecting a cause of action for breach of an implied covenant of good faith and fair dealing in employment situations. *See Fitzgerald*, 613 N.W.2d at 281 ("We have consistently refused to adopt a covenant of good faith and fair dealing with respect to at-will employment relationships."); *Huegerich*, 547 N.W.2d at 220 ("We expressly rejected a breach of an implied covenant of good faith and fair dealing exception to the employment at-will doctrine."); *Anderson*, 540 N.W.2d at 281 ("We have consistently rejected recognition of a covenant of good faith and fair dealing."); *Porter*, 497 N.W.2d at 871 ("Porter also relies on a theory of implied covenant of good faith and fair dealing. We have consistently rejected that theory in employment contract cases."); *French*, 495 N.W.2d at 771 ("French also urges us to adopt a cause of action for breach of an implied (in law) covenant of good faith and fair dealing, a theory that we expressly rejected in *Fogel*, 446 N.W.2d at 456–57."); *See also Phipps*, 558 N.W.2d at 204 ("In Iowa, the tort of breach of implied covenant of good faith and fair dealing has never been recognized in the employment context."); *Grahek*, 473 N.W.2d at 34 ("The tort of breach of implied covenant of good faith and fair dealing has never been recognized in the employment context in Iowa.").

In the present case, the court sees no reason to consider a cause of action specifically rejected by the Iowa Supreme Court on a number of occasions. A federal court "has limited discretion to adopt untested legal theories brought under the rubric of state law." *Affiliated FM Ins. Co. v. Trane Co.*, 831 F.2d 153, 155 (7th Cir.1987); *see also A.W. Huss Co. v. Continental Casualty Co.*, 735 F.2d 246, 253 (7th Cir.1984); *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1371 (7th Cir.1985); *Shaw v. Republic Drill Corp.*, 810 F.2d 149, 150 (7th Cir. 1987); *Hopkins v. ROS Stores, Inc.*, 750 F.Supp. 379, 381 (W.D.Wis.1990). In light of the Iowa Supreme Court's repeated and categorical refusal to recognize a cause of action for breach of an implied covenant of good faith and fair dealing in employment situations, the court does not believe that Nelson's breach of good faith and fair dealing claim provides any basis for this federal court to assume that the Iowa Supreme Court would recognize such a cause of action. The court, therefore, declines to take such a bold departure from Iowa law of recognizing a claim for breach of an implied covenant of good faith and fair dealing in the employment context. Defendants are therefore entitled to summary judgment on Nelson's claim of breach of covenant of good faith and fair dealing. Thus, defendants' Motion For Summary Judgment on this issue is also granted.

### E. Promissory Estoppel

Defendants further seek summary judgment on Nelson's promissory estoppel claim. Nelson asserts that in reliance on an agreement that he would have a job at Manhattan Beach Resort until he was 65 years old, he gave up "something of significant value in housing, tax deductions as well as existing and future employment opportunities." Compl. at ¶ 124. Defendants assert that Nelson cannot establish the required elements to establish promissory estoppel in this case.

■ Under Iowa law, the elements of promissory estoppel are:

"(1) a clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only by enforcement of the promise."

*Kolkman v. Roth,* 656 N.W.2d 148, 156 (Iowa 2003) (quoting *Schoff v. Combined Ins. Co. of Am.,* 604 N.W.2d 43, 47 (Iowa 1999)); *see also In re Marriage of Harvey,* 523 N.W.2d 755, 756 (Iowa 1994) (citing *Merrifield v. Troutner,* 269 N.W.2d 136, 137 (Iowa 1978)); *Farmers State Bank v. United Central Bank of Des Moines,* 463 N.W.2d 69, 71 (Iowa 1990); *National Bank of Waterloo v. Moeller,* 434 N.W.2d 887, 889 (Iowa 1989); *City of Cedar Rapids v. McConnell–Stevely–Anderson Architects & Planners, P.C.,* 423 N.W.2d 17, 19 (Iowa 1988); *Estate of Graham v. Fergus,* 295 N.W.2d 414, 418 (Iowa 1980); *Merrifield v. Troutner,* 269 N.W.2d 136, 137 (Iowa 1978); *Uhl v. City of Sioux City,* 490 N.W.2d 69, 73 (Iowa App.1992). The party asserting the doctrine of promissory estoppel as its theory of recovery has the burden of proving this theory, and "strict proof of all elements is required." *National Bank of Waterloo,* 434 N.W.2d at 889 (citing *Pillsbury Co. v. Ward,* 250 N.W.2d 35, 39 (Iowa 1977)). Here, defendants assert that Nelson's promissory estoppel claim fails because: (1) Long's statement did not rise to the level of a clear and definite promise; (2) any reliance on Long's statement was neither reasonable nor detrimental; and, (3) Nelson cannot establish that Long made the statement with the clear understanding that Nelson was seeking an assurance upon which Nelson could rely and without which Nelson would not act.

The first element of promissory estoppel Nelson must prove under Iowa law is the existence of a "clear and definite promise" between the parties. *See Kolkman,* 656 N.W.2d at 156; *Schoff,* 604 N.W.2d at 47; *In re Marriage of Harvey,* 523 N.W.2d at 756; *Farmers State Bank,* 463 N.W.2d at 71; *National Bank of Waterloo,* 434 N.W.2d at 889. No Iowa case has squarely defined a "clear and definite promise" for purposes of satisfying the first element of promissory estoppel; however, in *National Bank of Waterloo v. Moeller,* the Iowa Supreme Court compared three cases interpreting this element, attempting to distinguish the conclusions of the court regarding whether the agreement in each case was a "clear and definite agreement." *National Bank of Waterloo,* 434 N.W.2d at 889–90 (discussing *In re Estate of Graham,* 295 N.W.2d at 418–419; *Johnson,* 185 N.W.2d at 795–97; *Miller,* 66 N.W.2d at 272–75); *see also Chipokas v. Hugg,* 477 N.W.2d 688, 690–91 (Iowa Ct.App.1991) (discussing *National Bank of Waterloo* and the Iowa Supreme Court's analysis of the three aforementioned cases). In *Miller v. Lawlor,* the Iowa Supreme Court upheld an oral promise by a landowner not to build a home on his property that would block his neighbor's view. *Miller,* 66 N.W.2d at 272–75. In addition, in *Johnson v. Pattison,* the Iowa Supreme Court concluded that a promise not to use land for commercial purposes met the requirement of a "clear and definite agreement" to sustain a claim for promissory estoppel. *Johnson,* 185 N.W.2d at 795. In comparing its analysis in *Miller* and *Johnson,* the court indicated that the first element was satisfied in these two cases, where there was "a clear understanding by the promisor that the promisee was seeking an assurance upon which he could rely and without which he would not act." *National Bank of Waterloo,* 434 N.W.2d at 889; *see also Chipokas,* 477 N.W.2d at 691.

Nelson claims that he meets the first element of promissory estoppel in that a clear and definite agreement existed between him and Long that he would be retained in his employment at Manhattan Beach Resort until the age of 65 based on his conversation with Long on March 11, 2000, when Long asked him his age. After Nelson told Long his age, Long reportedly stated in reply, "[Y]ou probably want to work til you're 65." Nelson Dep. at p. 77. Nelson responded, saying, "[Y]es, I would probably want to do that." Nelson Dep. at p. 77. Although Iowa decisions provide no precise definition of a "clear and definite agreement," the Iowa Supreme Court has emphasized the necessity of "clarity" and "inducement" in order to satisfy the first element of promissory estoppel. *See National Bank of Waterloo*, 434 N.W.2d at 889 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90 (1981)). Thus, the court must consider the sufficiency of the evidence, and the reasonable inferences to be drawn from that evidence, on these two critical aspects of the purported promise in this case.

In analyzing the clarity of the alleged statements between Long and Nelson on March 13, 2000, Long's statement, "[Y]ou probably want to work til you're 65" and Nelson's response, "[Y]es, I would probably want to do that" are both far from being either "clear" or "definite." The statements are not clarified by the surrounding circumstances. *Chipokas*, 477 N.W.2d at 691. Because the statements here were not made in the context of any employment contract negotiations, the statements become more, not less, ambiguous. For example, Long's question is framed with the qualifier "probably." Nelson's response is equally iffy since he answers that he would "probably want to do that." The total lack of specificity in these two statements renders this conversation hopelessly ambiguous. Because the statements were ambiguous, it does not reason-

ably touch on or constitute a clear and definite promise on Long's part to employ Nelson until the age of 65. Furthermore, the evidence here compares unfavorably with the evidence of an agreement in both *Miller* and *Johnson,* the cases in which the Iowa Supreme Court found sufficiently clear and definite agreements to impose a promissory estoppel. *Johnson,* 185 N.W.2d at 796 (promise to use adjacent land for residential purposes only); *Miller,* 66 N.W.2d at 270 (promise not to construct a home that would obstruct a neighbor's view). In those cases, the defendants' attempts to refute the plaintiffs' claims of promissory estoppel virtually admitted the existence of a clear agreement and apparent understanding of the nature of the agreement; however, the defendants in both cases quibbled over minor details concerning the logistics of the agreements. Here, however, defendants dispute even a general agreement to employ Nelson for a specific period of time. The statements at issue here are more in keeping with the expression of a general desire which is insufficient to translate into a clear and definite agreement about the specifics of how that desire is to be executed. *See Graham,* 295 N.W.2d at 419 (expression of desire that decedent wanted to "keep the farm in the family" did not constitute clear and definite agreement to devise the farm to his brother). Viewing the evidence in the light most favorable to Nelson, the generic nature of the statements between Long and Nelson on March 13, 2000, are not susceptible to a reasonable inference that Long and Nelson had a clear and definite agreement under which Nelson would be retained in his employment with Manhattan Beach Resort until he reached the age of 65. Thus, the court concludes that Nelson's promissory estoppel claim fails because Long's statement does not rise to the level of a clear and definite promise. Therefore, defendants' Motion

For Summary Judgment on this issue is also granted.

### F. Unjust Enrichment

Defendants finally seek summary judgment on Nelson's unjust enrichment claim. The Iowa Supreme Court has explained the concept of unjust enrichment as follows:

> The term " 'unjust enrichment is an equitable principle mandating that one shall not be permitted to unjustly enrich oneself at the expense of another or to receive property or benefits without making compensation for them.' " *Robert's River Rides v. Steamboat Dev. Corp.*, 520 N.W.2d 294, 302 (Iowa 1994) (quoting *West Branch State Bank v. Gates*, 477 N.W.2d 848, 851–52 (Iowa 1991)). Under these principles, where a person acts to confer benefits on another in a setting in which the actor is not acting officiously, the benefited party may be required to make restitution to the actor. *Okoboji Camp Owners Co-op. v. Carlson*, 578 N.W.2d 652, 654 (Iowa 1998) (citing *Restatement of Restitution §§ 1, 2 (1936)*). Thus, where a person performs services for another which *are known to and accepted by the latter*, the law implies a promise to pay for those services. *Patterson v. Patterson's Estate*, 189 N.W.2d 601, 604 (Iowa 1971); *Snyder v. Nixon*, 188 Iowa 779, 781, 176 N.W. 808, 809 (1920) ("The general rule is that where one renders services of value to another with his knowledge and consent, the presumption is that the one rendering the services expects to be compensated, and that the one to whom the services are rendered intends to pay for the same, and so the law implies a promise to pay.").

*Credit Bureau Enterprises, Inc. v. Pelo*, 608 N.W.2d 20 (Iowa 2000) (emphasis added).

Under Iowa law, to recover under this theory, Nelson is required to show: (1) he conferred a benefit on defendants to his own detriment, (2) defendants had an expectation of receiving the benefit, (3) defendants accepted and retained the benefit under circumstances making it inequitable not to pay for the value, and (4) there is no remedy at law that can appropriately address the claim. *Iowa Waste Systems, Inc. v. Buchanan County*, 617 N.W.2d 23, 30 (Iowa Ct.App.2000). The only element of contention in this case concerns whether Nelson performed services for defendants which were known and accepted by defendants when he used his own tools and equipment to accomplish tasks on Manhattan Beach Resort's property. Defendants point out that Nelson had authority to maintain the resort. Nelson Dep. at 33. This authority included the ability to purchase equipment and tools which were to be used at Manhattan Beach Resort. Nelson Dep. at 82. When Nelson made such purchases he would sign the bill of sale and send it to Manhattan Beach's corporate office for payment. Nelson Dep. at 82. Nelson was never instructed not to purchase tools. Nelson Dep. at 82. Defendants further point out that when Chuck Long saw Nelson using Nelson's own riding lawn mower at Manhattan Beach Resort, he immediately told him not to use his own equipment for resort work. Long Aff. at ¶ 9. Chuck Long further avers that until that time he was unaware that Nelson was using his own personal equipment for work at Manhattan Beach Resort. Long Dep. at 159. Long states that he assumed that any equipment he didn't recognize as belonging to Manhattan Beach Resort was being leased by Nelson for the resort. Long Dep. at 159. Thus, here, defendants, as the moving party have met their "initial responsibility of informing the district court of the basis for [their] motion and identifying those portions of the record which show lack of a genuine issue."

*Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548); *see also Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). Because defendants have carried their burden under Rule 56(c), Nelson "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Nelson is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach*, 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir. 1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that Nelson as the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allison*, 28 F.3d at 66. Here, Nelson has not produced any record evidence that would contradict Long's submissions. He points to the fact that Manhattan Beach Resort maintained lists of equipment for the purposes of depreciation. Nelson suggests that because Manhattan Beach Resort maintained such lists, it had actual or constructive knowledge of Nelson's purchase and use of his own equipment and tools. This argument ignores the fact that the existence of such a list would not apprise one observing Nelson performing his duties at Manhattan Beach Resort, such as Chuck Long, that the tools and equipment being used were not on the list or that the tools and equipment were not being temporarily leased or rented. Indeed, Chuck Long stated in his deposition that when he didn't recognize equipment he assumed Nelson had leased it somewhere. Long Dep. at 159. Thus, the court concludes that Nelson has failed to generate a genuine issue of material fact that defendants knew and accepted Nelson's performing tasks on Manhattan Beach's property using his own tools and equipment. Therefore, defendants' Motion For Summary Judgment on this issue is also granted.

## III. CONCLUSION

The court concludes that defendants are entitled to summary judgment on Nelson's direct evidence ADEA claim, because Nelson has failed to present any direct evidence of discriminatory animus on the part of defendants. The court further concludes that Nelson has failed to establish a *prima facie* case of age discrimination under the ADEA because Nelson has not pointed to sufficient record evidence that age played a role in his termination. Alternatively, the court concludes that summary judgment is also appropriate on Nelson's ADEA claim on the ground that he cannot satisfy the third stage of the *McDonnell Douglas* burden-shifting analysis. The court also grants summary judgment is granted as to Nelson's FLSA claim because Manhattan Beach, Inc. does not have the requisite $500,000 in gross receipts during the period of time pertinent to this litigation to be subject to the FLSA. The court further concludes that Nelson's promissory estoppel claim fails because Long's statement does not rise to

the level of a clear and definite promise. Finally, the court grants defendants' Motion for Summary Judgment on Nelson's unjust enrichment claim because Nelson has failed to generate a genuine issue of material fact that defendants knew and accepted Nelson's performing tasks on Manhattan Beach's property using his own tools and equipment. Therefore, defendants' Motion for Summary Judgment is granted. This case is dismissed in its entirety.

**IT IS SO ORDERED.**